UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------x
In re

Outpost Pines LLC,

Debtor.
-----------------------------------------------------x

Chapter 11

Case No. 23-70617 (REG)

**Local Rule Statement**

STATE OF NEW YORK )
) ss:
COUNTY OF NEW YORK )

Patrick J McAteer, as Authorized Signatory of Outpost Pines LLC (the "Debtor"), deposes and says under penalty of perjury, as follows:

1. I submit this declaration under Local Bankruptcy Rule 1007-4 in support of the Debtor's filing of its voluntary petition under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

2. On February 23, 2023 (the "Petition Date"), the Debtor filed a Chapter 11 petition under Title 11 of the United States Code, 11 U.S.C. 101 et seq. (the "Bankruptcy Code").

3. The Debtor owns, and through non-Debtor affiliates, operates properties (the "Properties") in the Fire Island Pines community (the "Pines"). The Pines is the largest LGBTQ+ resort in the United States and welcomes over 250,000 people each season.

4. The Properties are mixed-use and account for about 80% of the Pines commercial district. In season, the Debtor's non-Debtor affiliates employ 120 workers, entertainers, DJs and other artists. The Debtor's affiliates provide the major source of food, beverage, shopping, entertainment and community to the homeowners and renters that surround the Debtor's Properties.

5. At 49 & 56 Picketty Ruff Walk, an affiliate runs the Blue Whale restaurant and bar, and the Hotel featuring 21 guestrooms and two retail stores. 37 Fire Island Boulevard is the Pavilion building. The ground floor features a gym and juice bar, two retail stores and administrative offices. The upper floor features the Pavilion nightclub and outside bar. 28 Fire Island Boulevard is a three-bedroom two-bathroom house that serves as a staff accommodation. 16 Atlantic Walk is a 16-bedroom/eight-bathroom residence built in 1975 and renovated in 2016 that also houses resort staff in the summer season.

6. The Properties also feature about 320 feet of frontage along the harbor, with room for 9 boat slips with an average size of 35 feet.

7. On March 31, 2015, the Debtor borrowed $8 million from Progressive Credit Union (the "Loan") under an agreement ("Loan Agreement") to acquire and renovate the Properties. The Loan Agreement has a ten-year term, the interest rate is 3% and has a five-year extension option. The Loan was assigned to Pentagon Federal Credit Union and then to ECapital Loan Fund III LP (the "Lender" or the "Mortgagee").

8. The Debtor paid the Lender timely until the pandemic related government-ordered shutdown of the hospitality industry. The travel restrictions and quarantine requirements caused the Debtor to delay its 2020 seasonal opening and to dramatically curtail operations when it did open on May 29, 2020. When the government lifted restaurant and bar seating and social distancing requirements in June 2021, the Debtor and Debtor affiliates resumed reduced operations for the 2021 season and full operations for the 2022 season. Income rebounded and exceeded pre-pandemic levels.

9. Meanwhile, in March 2020, the Debtor reached out to the Lender when it could not reopen in April 2020. Pentagon Federal Credit Union had just taken over Progressive Credit Union, the initial Lender, in an emergency merger. The Debtor promptly provided all documentation the Lender requested. The Lender agreed to defer debt service for the months of May 2020 through September 2020 and thus extended the Loan maturity date from April 1, 2025 to October 1, 2025. Debtor's counsel conveyed many verbal settlement proposals to Lender's counsel. At the Lender's request, on August 6, 2021, the Debtor made a formal written restructuring proposal, and then another on April 7, 2022.

10. By then, the Lender had accelerated its Loan and demanded payment in full of all amounts due including principal, interest, default interest and other charges. On January 19, 2022, the Lender commenced a foreclosure action in the Supreme Court of Suffolk County. The case was largely dormant while counsel to the parties continued to negotiate.

11. The Debtor repeatedly offered to reinstate the Loan once its business rebounded and it had access to sufficient cash. The Lender repeatedly refused tender unless the Debtor paid five times the amount of the overdue interest.

12. The Lender finally agreed to an in-person meeting on July 26, 2022, followed by telephonic meetings on October 7, 2022. On October 7, a loan modification was agreed upon subject only to Lender's senior management approval. Then the Lender went silent. The last communication from the Lender before its sale of the Loan to ECapital Loan Fund III LP was an October 12, 2022 email from the Lender stating that senior management was still reviewing the modification terms.

13. Since accruing 16% default interest made the loan easier to sell, it now seems obvious that the Lender was delaying the Debtor while marketing the paper. Indeed, the Lender engaged a national broker to market the Loan and obtained a real estate collateral appraisal in January 2022 establishing a $13,500,000 fair market asset value, far more than the amount owed to the Lender under any analysis.

14. On November 4, 2022, the Debtor was notified that ECapital Loan Fund III acquired the Loan. Since November 4, 2022, ECapital has repeated Pentagon Federal Credit Union's negotiate, delay and disappear strategy. For example, the Debtor was promised an updated settlement proposal on February 3, 2023 and since then Lender has not communicated with Debtor despite multiple emails and voice messages.

15. Fearing the *ex-parte* appointment of receiver who likely could not preserve and protect the value of the Debtor's unique operation, the Debtor commenced this Chapter 11 case to save its business and over 120 jobs.

16. The Debtor estimates that $7,347,551 of principal is due on the Loan. Although the Lender has not provided a current payoff letter, the Debtor projects that as of February, 2023, the Lender will assert that the Debtor owes about $2,385,000 for 16% default interest, as compared to about $532,000 for 3% regular interest. Amortization payments are due as well. Based on old payoff letters, the Debtor projects that the Lender will also demand escrow replenishments of about $218,000, legal fees of $25,000 and late charges of $14,764, none of which the Debtor is in a position to concede absent more detail and analysis. The Debtor projects that the ultimate cure cost to reinstate the Loan will be between $1,254,677 and $3,108,142 for interest, amortization, escrow replenishments, legal fees and late fees.

17. Aside from mortgage debt, the Debtor's obligations include an insider loan of about $1,549,221, an SBA disaster assistance loan of about $161,941 and vendor claims of about $8,200.

18. The Debtor intends to promptly propose and confirm a plan of reorganization providing for an all-cash cure and reinstatement of the Loan, and to pay all other creditors in full. The Debtor will propose invoking section 1124(2) of the Bankruptcy Code, under which a creditor may be compelled to reinstate an obligation in default even if the obligation could not be reinstated under state law.

19. Under the plan, the Debtor asserts that it should not have to pay default interest as a condition to reinstatement. The Debtor assumes that the Lender will disagree. To advance the issue, the Debtor is including herein a preview of its argument, that there is compelling case law supporting reinstatement without payment of default interest. *E.g.*, *In re Taddeo*, 685 F.2d 24 (2d Cir.1982); *accord, In re Forest Hills Associates,* 40 B.R. 410 (Bankr. S.D.N.Y. 1984); *In re Manville Forest Products Corp.*, 43 B.R. 293 (Bankr. S.D.N.Y. 1984); *In re Kizzac Management Corp.*, 44 B.R. 496 (Bankr. S.D.N.Y. 1984).

20. As stated in *Taddeo*: "Curing a default commonly means taking care of the triggering event and returning to pre-default conditions. The consequences are thus nullified. This is the concept of "cure" used throughout the Bankruptcy Code. . . the cure need address only the individual event of default, thereby repealing the contractual consequences." *In re Taddeo*, 685 F.2d 24, 26–27 (2d. Cir. 1982).

21. A plan that provides for payment at the non-default contract interest rate "take[s] care of the triggering event" that triggered default interest, and "the event of default is

remedied and the consequences," which consequences include the requirement to pay default interest, "are thus nullified."

22. Admittedly, there is case law to the contrary, but none of it is binding on this Court. Most prominently, the Ninth Circuit held in *In re New Investments., Inc,* 840 F.3d 1137 (9th Cir. 2016) that section 1123(d) of the Bankruptcy Code requires payment of default interest to reinstate under section 1124 of the Code.

23. The Ninth Circuit's reliance on section 1123(d) to require default interest to reinstate is misplaced. Section 1123(d) of the Code states that to cure a default, "the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable non-bankruptcy law." 11 U.S.C. §1123(d). Although the *New Investments* Court acknowledged that the section 1123(d) was enacted primarily to overrule *Rake v Wade,* 508 U.S. 464 (1993), which allowed creditors to charge interest on interest, the court concluded that the text of the statute does not limit itself to that purpose. *Id.* at 1141.

24. *New Investments* was decided by two judges of a three-judge panel. The dissenting judge wrote a convincing dissent. The dissent explains that although section 1123(d) states that a cure "shall be determined in accordance with the underlying agreement," section 1123(d) "offers no guidance on which of the note's provisions governs." *Id.* at 1144.

25. The dissent explained further that such guidance must, in the Ninth Circuit, come from *Entz White,* and its holding that "that a "cure" permits the debtor to "avoid all consequences of the default."" *Id.* at 1145. Since *Entz-White* adopted the Second Circuit *Taddeo* definition of cure, the dissent's logic applies equally in the Second Circuit.

26. Thus, "the relevant provisions of the 'underlying agreement' for a 'cure' are those that would have applied 'if the default had never occurred.'" *Id*. And had a default never occurred, the debtor only owes non-default interest.

27. In reviewing the legislative history, the dissent found more support for its analysis in the following passage from the House Report: "[i]t is the Committee's intention that a cure pursuant to a plan should operate to put the debtor in the same position as if the default had never occurred." The dissent found that "Like the text of the statute, the legislative history in no way suggests that *Entz-White*'s definition of "cure" is incorrect or was overruled." *Id*.

28. The dissent concluded that:

> Here, the underlying agreement provides both pre- and post-default interest rates. As the statute requires, we look to that agreement in determining which rates may apply. And in selecting which provision of the contract governs, we rely on our precedent and use the pre-default rate. New Investments therefore could cure the default by paying interest on the debt at the pre-default rate.

*Id*.

29. The Debtor respectfully submits that the dissent in *New Investments* is more convincing than the majority and this Court should hold, consistent with *Taddeo*, that the Debtor may reinstate the Mortgagee's Loan at the non-default contract rate of interest.

30. Alternatively, among other things, the Debtor may argue that knowing that the Debtor has substantial equity in its Properties, the Lender delayed the mortgage foreclosure action to improperly burden the Debtor with default interest. *See In re Heavey*, 608 B.R. 341 (Bankr. E.D.N.Y. 2019).

31. No pre-petition committee was organized before the Order for relief.

32. A summary of the Debtor's' assets and liabilities is forth on the Debtor's summary of schedules.

33. The names and addresses of the Debtor's twenty largest unsecured creditors, has been filed with the Petition.

34. All suits or proceedings in which the Debtor is named as a party are listed in the Debtor's Statement of Financial Affairs.

35. In should be noted that pre-petition, some subsidiary expenses were paid by the Debtor with funds contributed by the subsidiaries. For example, it was convenient to maintain payroll for all subsidiaries at the parent level since some employees work for more than one subsidiary. Post-petition, only Debtor income and expenses will pass through the Debtor's DIP account. Expenses will include debt service, insurance, taxes and court-approved professional fees.

Dated: New York, New York
February 28, 2023

s/Patrick J McAteer, as Authorized Signatory